**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

WILLIAM E. BABER,

        Plaintiff,

vs.

FIRST REPUBLIC GROUP, L.L.C.,
and EVAN PARKS,

        Defendants.

No. C 06-3076-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

————————————

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *A.* *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . 16
   *B.* *The Breach Of Duty Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      *1.* *Breach of contract* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
         *a.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 20
         *b.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      *2.* *Breach of duty of good faith and fair dealing* . . . . . . . . . . . 28
         *a.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 28
         *b.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      *3.* *Breach of fiduciary duty* . . . . . . . . . . . . . . . . . . . . . . . . 31
         *a.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 32
         *b.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
           *i.* *Existence of a fiduciary duty* . . . . . . . . . . . . . 33
           *ii.* *Scope of the duty* . . . . . . . . . . . . . . . . . . . . 38
   *C.* *The Theft And Fraud Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      *1.* *The claims at issue* . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      *2.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . . 41

       **3.**      *The "misappropriation/theft" claim* . . . . . . . . . . . . . . . . . 41
             *a.*     *Nature of the claim* . . . . . . . . . . . . . . . . . . . . . . 41
             *b.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       **4.**      *The "fraud" claims* . . . . . . . . . . . . . . . . . . . . . . . . . 47
             *a.*     *Nature of the claims* . . . . . . . . . . . . . . . . . . . . . 47
             *b.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*III.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Has an investor asserted any viable claims for redress from what he contends were excessive—and secret—mark ups and mark downs on share prices charged by his broker-dealer and account representative on various securities transactions? The investor has alleged a panoply of contract and tort claims, but the broker-dealer and account representative contend that all of those claims are deficient as a matter of law. The defendants argue that the investor cannot claim after the fact that the mark ups and mark downs were "excessive" or "fraudulent," when the investor had no contract governing such charges and, in any event, the mark ups and mark downs were disclosed on the trade confirmation slips and monthly account statements sent to the investor, but the investor did not complain about them at the time. On the defendants' motion for summary judgment, the court must determine whether the investor has stated any factually and legally viable claims.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' motion for summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in the court's legal analysis.

Plaintiff William E. Baber is a retired orthodontist from Fort Dodge, Iowa, who was in his eighties at the time of the events giving rise to his claims in this matter. Baber has a net worth of approximately three to four million dollars and has been trading stocks for approximately fifty years. At the times pertinent here, Baber held brokerage accounts with UBS (formerly known as Paine Webber) and Edward Jones & Co., as well as the account at issue in this litigation with defendant First Republic Group, L.L.C., and he had previously held an account with Merrill Lynch. The parties agree that Baber made trades and investments based on suggestions of his various brokers, but most of his trades and investments were based on his own ideas and research. The parties agree that Baber received trade confirmations and account statements concerning his various brokerage accounts with UBS or Paine Webber and Edward Jones and that he had no trouble understanding them.

Defendant First Republic is a securities broker-dealer located in New York City. At all times pertinent to this action, defendant Evan Parks (also known as Elvis Parkes) was an employee of First Republic and the registered account representative assigned to Baber's brokerage account with First Republic. Baber had an account with First Republic from 2001 through the end of 2006, or about five years. Baber testified in deposition that

he opened his account with First Republic, because his other brokers did not call often, and he believed that Parks had "great ideas." Although Baber also testified that the issue of what compensation Parks would receive on trades was "very important," he admitted that he did not have a conversation with Parks at the time that he opened the account regarding what sort of compensation Parks would receive. Instead, Baber assumed that there would be a charge for his First Republic transactions "like any other broker." The parties agree that there is no written contract or other document setting forth what Baber would be charged for his transactions executed through First Republic, nor did Baber reach any sort of agreement with Parks or anyone else at First Republic concerning what fees or commissions he would be charged.

At issue in this case are various "mark ups" and "mark downs" that Baber discovered had been charged on transactions in his First Republic account.[1] Baber now contends that the "secret" mark ups and mark downs were "excessive," noting that they totaled over $147,000, while his account value was only between $150,000 and $300,000. First Republic contends that there was nothing "secret" about the mark ups and mark downs, so that Baber cannot now contend that they were somehow "excessive" or "unreasonable," when he made no contemporaneous complaint about them.

Transactions on First Republic brokerage accounts were "cleared" through clearing brokers, either BNY Clearing Services, L.L.C., (BNY), or Pershing, L.L.C., (Pershing) at the times pertinent here. First Republic contends that the clearing broker on each

---

[1]As the Second Circuit Court of Appeals has explained, "A markup [or mark down] is the difference between the price charged to a customer for a security and the prevailing market price for the security. . . ." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 533 n. 2 (2d Cir. 1999); *see also Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 111 n.6 (2d Cir. 2005) (quoting *Press*).

transaction sent the investor a trade confirmation slip, although Baber alleges that he did not believe that he had received trade confirmation slips for all of the trades in his First Republic account. The parties apparently agree that two confirmation slips are representative of those Baber purportedly received for transactions on which Baber contends that First Republic improperly charged "excessive" or "unreasonable" and "secret" mark ups and mark downs, because these are the only confirmation slips included in either party's summary judgment appendix.

The first such representative confirmation slip is for a purchase by Baber of 5,000 shares of Toys "R" Us, Inc., stock on November 27, 2002. Defendants' Appendix at 144; Plaintiff's Appendix at 100. The confirmation slip shows, as the "Trade Cost," that Baber purchased the stock "at $13.683000," for a "Net Amount" of $68,415.00, with a "SEC Fee and/or Handling" of $29.95, for a "NET AMOUNT" of $68,444.95. This confirmation slip includes the following "Additional information": "Transaction executed as principal. Reported trade price 13.2230. Mark up/down 0.46000." The parties apparently agree that Baber was actually charged a $0.46 per share mark up in the price of the stock from the "reported trade price," $13.2230, to the per share price shown under "Trade Costs," $13.683000, so that Baber paid First Republic $2,300 for executing the transaction ($0.46 mark up per share times 5,000 shares equals $2,300) in addition to the cost of the shares, at market price, and the $29.95 "SEC Fee and/or Handling." The confirmation slip is shown below, with pencil markings that the parties agree were made by Baber, although they do not know when he made such markings:

First Republic Group, LLC
1430 Broadway 5th Floor
New York, NY 10018
Ph: (212) 768-1800

*11/27/02*

$300

We hereby confirm the following transaction subject to the Terms and Conditions described on the back. Retain this confirmation for your records and Income Tax Purposes. Payment for securities or other investments purchased and delivery of securities or other investment instruments are due on SETTLEMENT DATE unless otherwise stated. If sufficient funds (cash, margin or money market balances) are already on deposit with us, we will automatically debit your account. Otherwise, contact your Account Executive immediately to make arrangements for settlement.

#5000002334 12 NNNN
DR WILLIAM E BABER
1319 N 13TH STREET
FORT DODGE IA 50501-7561

Your Account Executive:
EVAN PARKS (FR49)

EXHIBIT
9 defendant
12-15-17 br

## TRADE CONFIRMATION

ACCOUNT NUMBER FR49-1253-7906    TRADE DATE 11/22/02    SETTLEMENT DATE 11/27/02

| YOU BOUGHT | Quantity | Description | Trade Costs | Net Amount |
|---|---|---|---|---|
| In Your Margin Account Solicited | 5,000 | TOYS "R" US INC. Symbol TOY  01 CUSIP NO 892335-10-0 | at $13.683000 | $58,415.00 |
| | | | SEC Fee and/or Handling | $29.95 |
| | | | NET AMOUNT | $58,444.95 |

Additional Information:
Transaction executed as principal. Reported trade price 13.2230. Mark up/down 0.4600.

*13,6836*
*13,2230*
*.4606-*

*2300*

- - - - - - ✂ DETACH HERE - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂ DETACH HERE - - - - - -

ACCOUNT NUMBER FR49-1253-7906    REMITTANCE or INVESTMENT SLIP

Return this copy with your remittance and/or securities. This document can also be used as an investment Slip designed to add to your investment account. Checks must be made payable to BNY Clearing Services, LLC.

Please indicate here the amount included with this remittance slip _____

[ ] Please check here if a new address or account change is noted on the reverse side.

Deposit to account of:
DR. WILLIAM E BABER
1319 N 13TH STREET
FORT DODGE IA 50501-7561

Mail To:
FIRST REPUBLIC GROUP, LLC
1430 BROADWAY 5TH FLOOR
NEW YORK, NY 10018

In account with BNY Clearing Services LLC
P.O. Box 299
Milwaukee, WI 53202

SIPC
144
Members New York Stock Exchange and other principal exchanges    31

6

The second such representative confirmation slip is for a purchase by Baber on September 29, 2003, of 5,000 shares of Pfizer, Inc., stock. Defendants' Appendix at 143. The confirmation slip shows the "PRICE" as 31.94, the "PRINCIPAL" as $159,700.00, the "SERVICE CHARGE" as $29.95, and the "NET AMOUNT" of the transaction as $159,729.95. Below this information, the confirmation slip also shows the following: "NY 30.94 RPTD PRC $30.94000," and below that, "MK-U/D $1.00000SH." The parties apparently agree that Baber was actually charged a $1 per share mark up over the "RPTD PRC," or "reported price," $30.94000, to the "PRICE" per share, $31.94, that Baber paid, so that Baber paid First Republic $5,000 for executing the transaction in addition to the cost of the shares, at market price, and the $29.95 "service charge." This confirmation slip is shown below:

Clearing Through

 **Pershing** LLC   One Pershing Plaza, Jersey City, New Jersey 07399

FIRST REPUBLIC GROUP LLC
1430 BROADWAY 5TH FLOOR
NEW YORK NY 10018
TEL: (212) 768-1800


EXHIBIT
7 Defendant
12-15-02 bw

# CONFIRMATION

MAIL TO:                                                                    PAGE 1

FOR THE ACCOUNT OF :                    ACCOUNT NUMBER:    39Y-151945
                                        ACCOUNT TYPE:      2

DR WILLIAM E BABER              DR WILLIAM E BABER
1319 NORTH 13TH                 1319 NORTH 13TH
FORT DODGE IA 50501-7561        FORT DODGE IA 50501-7561    YOUR ACCOUNT EXECUTIVE:
                                                            EVAN PARKS
                                                            A.E. NUMBER:      R49

| YOU BOUGHT:                  | |
|---|---|
| PFIZER INC COM | TRADE DATE:        09-29-03 |
| | PROCESS DATE:      09-29-03 |
| | SETTLEMENT DATE:   10-02-03 |
| | CUSIP NUMBER:      717081-10-3 |
| | SYMBOL:            PFE |

WE CONFIRM THE BELOW TRADE(S), SUBJECT TO THE TERMS AND CONDITIONS ON THE REVERSE SIDE.

| TRADE NUMBER | QUANTITY | PRICE | PRINCIPAL | INTEREST/ STATE TAX | COMMISSION | SERVICE CHARGE | S.E.C. FEE | NET AMOUNT | MKT/ CPTY |
|---|---|---|---|---|---|---|---|---|---|
| S05011 | 5,000 | 31.94 | 159,700.00 | | | 29.95 | | 159,729.95 | 4/5 |
| | NY | | 30.94 | | RPTD PRC $ 30.94000 | | | | |
| | MK-U/D $ | 1.00000SH | | | | | | | |

| TOTALS | 5,000 | | 159,700.00 | | | 29.95 | | 159,729.95 | |
|---|---|---|---|---|---|---|---|---|---|

THIS CONFIRMATION IS AN ADVICE NOT AN INVOICE. REMITTANCE OR SECURITIES ARE DUE ON OR BEFORE SETTLEMENT DATE.

| FOR THE ACCOUNT OF: | ACCOUNT NUMBER:  39Y-151945 | YOU BOUGHT:        PFE |
|---|---|---|
| DR WILLIAM E BABER | ACCOUNT TYPE:    2 | PFIZER INC COM |
| 1319 NORTH 13TH | | |
| FORT DODGE IA 50501-7561 | YOUR ACCOUNT EXECUTIVE: | |
| | EVAN PARKS | |
| | A.E. NUMBER:      R49 | |

| TRADE DATE:      09-29-03 | QUANTITY:          5,000 | NET AMOUNT:      159,729.95 |
|---|---|---|
| PROCESS DATE:    09-29-03 | | |
| SETTLEMENT DATE: 10-02-03 | CUSIP NUMBER:    717081-10-3 | |

SEE REVERSE SIDE FOR TERMS AND CONDITIONS AND EXPLANATION OF CODED SYMBOLS RELATING TO THIS CONFIRMATION.
ON OTHER THAN ROUND LOTS (NORMALLY 100 SHARES) IF DIF APPEARS ABOVE, AN ODD-LOT DIFFERENTIAL HAS BEEN CHARGED IN CONNECTION WITH THIS TRANSACTION.
THE AMOUNT OF SUCH DIFFERENTIAL WILL BE FURNISHED UPON REQUEST.

First Republic contends that Baber has admitted that he did not always look at the confirmation slips when he received them and that, when he did look, he would look only at the quantity purchased, the trade cost, and the total amount. Baber disputes this allegation to the extent that he asserts that he complained on occasion to Parks when the commissions were in the $100 range rather than the $30 range that he expected. Baber denies that he understood before December 2004 that he was being charged a "mark up" or "mark down" on any transaction and, indeed, denies that he knew what a "mark up" or "mark down" was, because none of his other brokers had ever charged him "commissions" in this way. He also denies that he understood before December 2004 that a "reported price" or "rptd prc" shown on some trade confirmation slips was actually the market price of the stock. He also points out, and the defendants admit, that when Parks was reviewing a confirmation slip during his deposition, he thought the "price" listed on the confirmation slip was the market price, rather than the price paid by (or to) the customer.

First Republic contends that monthly statements, mailed by the clearing broker, also showed the reported price and any mark ups or mark downs on trades that month. Although neither party has provided the court with copies of the monthly statements for the months of the transactions for which confirmation slips are shown above, First Republic has provided other monthly statements. Thus, below, is the page of Baber's First Republic account statement for November 2003 showing, *inter alia*, "Securities Bought and Sold." Defendants' Appendix at 146. This portion of the statement shows that, on November 7, 2003, Baber sold 6,500 shares of EMC Corp. stock for a "Price" of 13.4600, for a transaction in the "Amount" of $87,455.95, with the following further "Description": "13.94 RPTD PRC $ 13.94000 MK-U/D $ .4800SH." This portion of the statement also shows that, on November 7, 2003, Baber purchased 1,000 shares of

Novastar Financial stock for a "Price" of 80.2290 for a transaction in the "Amount" of $80,258.95, with the following further "Description": "NY 79.229 RPTD PRC $78.22900 MK-U/D $ 2.00000SH." The page of the monthly statement in question is shown below:

## Customer Service Information

**Your Investment Consultant:**
Identification Number: R49
EVAN PARKS

## Transactions by Type of Activity

| Process/ Settlement Date | Trade/ Transaction Date | Activity Type | Description | Quantity | Price | Accrued Interest | Amount |
|---|---|---|---|---|---|---|---|
| **Securities Bought and Sold** | | | | | | | |
| 11/07/03 | 11/04/03 | SOLD | EMC CORP (MASS) COM NY 13.94 RPTD PRC $ 13.94000 MK-U/D $ 48000SH | -6,500.000 | 13.4600 | | 87,455.95 |
| 11/07/03 | 11/04/03 | PURCHASED | NOVASTAR FINCL INC COM NY 78.229 RPTD PRC $ 78.22900 MK-U/D $ 2.60000SH | 1,000.000 | 80.2290 | | -80,258.95 |
| **Total Securities Bought and Sold** | | | | | | | **$7,197.00** |
| **Dividends and Interest** | | | | | | | |
| 11/17/03 | | BOND INTEREST RECEIVED | 25000 GENERAL MTRS ACCEP CORP SMARTNOTES TRANCHE # TR 00715 7.300% 01/15/18 B/E DTD 01/22/03 CLB RD 10/31 PO 11/17/03 | | | | 152.08 |
| 11/19/03 | | CASH DIVIDEND RECEIVED | 1500 SHRS NOVASTAR FINCL INC COM RD 11/05 PO 11/19/03 | | | | 3,750.00 |
| 11/20/03 | 11/19/03 | INT. CHARGED ON DEBIT BALANCES | MARGIN INTEREST FOR 31 DEBIT DAYS AV BAL 208776.80 RATE 5.750 10-20-03 TO 11-19-03 DEBIT BAL 11-19-03 WAS 200831.51 | | | | -1,033.74 |
| **Total Dividends and Interest** | | | | | | | **$2,868.34** |
| **Total Value of all Transactions** | | | | | | | **$10,065.34** |

The price and quantity displayed may have been rounded.

Account Number: 39V-151945
DR WILLIAM E BABER

Clearing Through **Pershing** A BNY Securities Group Co.
Subsidiary from The Bank of New York

One Pershing Plaza, Jersey City, New Jersey 07399
Member NYSE-FINRA-SIPC, securely.www.pershing.com

C9090902896♦♦♦♦♦

11

Baber contends that the monthly statements contained the same "cryptic" information as the confirmation slips, although he admits that he now understands that this monthly statement shows that he was charged a mark up or mark down on each of the stock trades he made that month and that he now understands that the "RPTD PRC" was actually the market price of each stock. Baber also admits that he never asked Parks what the abbreviations "RPTD PRC" or "MK-U/D" stood for. Baber points out that none of the confirmation slips or the monthly statements lists the total dollar amount of any mark up or mark down, but First Republic counters that the total can be easily determined by multiplying the number of shares times the amount of any mark up or mark down. Although First Republic admits that a mark up or mark down is a kind of "commission," the amount of such mark ups or mark downs is not disclosed under the "commission" or "fees" categories on any of the confirmation slips or monthly statements.

First Republic contends that Baber approved each and every purchase and sale in his First Republic account on which such mark ups or mark downs were charged, with the possible exception of one sale of P.F. Chang stock that Baber could not recall authorizing. First Republic contends that the P.F. Chang transaction is not at issue in this litigation. Baber contends, however, that mark ups and mark downs on the P.F. Chang trades are included in transactions through First Republic at issue in this case. More specifically, he alleges that First Republic charged him a mark down of $6,000 on the unauthorized sale of the P.F. Chang stock, then charged him a mark up of $6,000 on the repurchase of the P.F. Chang stock that was supposed to correct First Republic's "mistake" in selling the stock.

By late 2004, Baber had begun to wonder why the value of his First Republic account was decreasing, so he spread out all of the trade confirmations that he had on his livingroom floor to look them over. He decided that he needed help, so he called Steve

Duesenberg, his UBS broker. Duesenberg came to Baber's house in December 2004 and explained what had happened. Baber contends that Duesenberg's explanation was the first time that he understood what a mark up or mark down was and that mark ups and mark downs were, in essence, "commissions" added to the costs of the transactions in addition to the "commissions" or "fees" explicitly charged on the confirmation slips. Following the December 2004 meeting, Baber asked Duesenberg to take with him all of Baber's copies of his First Republic account statements and trade confirmations. During the spring of 2005, Duesenberg prepared a spreadsheet from the information in Baber's First Republic confirmation slips and account statements that showed the dollar value of each mark up or mark down that Baber had been charged in connection with his trades. Again, Baber now contends that the "secret" mark ups and mark downs totaled over $147,000, while his account value was only between $150,000 and $300,000. Duesenberg told Baber, among other things, that he believed that Baber could get the same trades cheaper somewhere else.

Notwithstanding the information provided by Duesenberg, Baber did not complain to Parks or have any discussion with him about mark ups or mark downs, nor did he have any conversation with any of Parks's supervisors. Indeed, First Republic contends that Baber continued to conduct trades through Parks and First Republic. Baber admits that he conducted a limited number of trades through First Republic in 2005 and 2006, but he explains that he is an elderly gentleman and that Parks was a "very persuasive talker." He also points out that no mark ups or mark downs were charged on any transactions in his First Republic account after December 2004. Eventually, in November 2006, Baber signed paperwork to transfer his First Republic account, as well as his other accounts, to UBS to effectuate a long-contemplated consolidation of his accounts.

Parks testified in deposition that the mark ups and mark downs that he charged in Baber's account were probably the same as those that he charged his other customers—all 300 or 400 of them—for similar trades. However, Baber asserts that the commissions charged to his account as of September 2004 were roughly twenty-four percent of Parks's total commissions. In January 2007, Parks's license was suspended by the National Association of Securities Dealers (NASD) for 35 days for an unauthorized trade in another customer's account. Parks was terminated by First Republic on or about February 15, 2007, because he made an unsuitable trade for an individual and engaged in other activities that gave rise to customer complaints. Baber contends that, by the time that Parks was terminated, he had filed his Complaint in this action and that his claims arising from Parks's conduct were part of the reason that Parks was terminated.

## B. *Procedural Background*

Baber filed suit against First Republic and Parks on or about October 19, 2006, in Iowa District Court for Webster County, but the defendants removed the action to this court on November 17, 2006. Although the defendants then sought to compel arbitration and stay proceedings, this court denied their motion to do so on February 21, 2007. Order of February 21, 2007 (docket no. 15). Trial was, therefore, set in this matter for April 14, 2008. Baber filed a First Amended Complaint on March 27, 2007 (docket no. 22), which the defendants answered on April 16, 2007. After a status and scheduling conference, the trial was reset for July 14, 2008.

Baber filed a Second Amended Complaint on January 9, 2008 (docket no. 48), which First Republic answered on January 29, 2008 (docket no. 50), and Parks answered on February 1, 2008 (docket no. 51). The claims in Baber's Second Amended Complaint are the following: common-law fraud by both defendants (**Count I**); securities fraud in

14

violation of the Iowa Securities Act by both defendants (**Count II**); breach of contract by First Republic (**Count III**); breach of the duty of good faith and fair dealing by First Republic (**Count IV**); breach of fiduciary duty by both defendants (**Count V**); misappropriation or theft of funds by both defendants (**Count VI**); and securities fraud in violation of federal law by both defendants (**Count VII**). Baber seeks actual and punitive damages, plus interest and court costs, and such other relief as the court deems appropriate. The defendants deny Baber's claims and assert various affirmative defenses.

This matter comes before the court pursuant to the defendants' joint March 17, 2008, Motion For Summary Judgment (docket no. 57), in which the defendants seek summary judgment on all of Baber's claims. Baber filed his resistance (docket no. 58), on April 4, 2008, and the defendants filed a reply (docket no. 59) on April 11, 2008.

The defendants requested oral arguments on their Motion For Summary Judgment. Therefore, the court set oral arguments on the defendants' Motion For Summary Judgment for May 16, 2008. At the oral arguments, plaintiff William E. Baber was represented by Steven L. Nelson of Davis, Brown, Koehn, Shors & Roberts, P.C., in Des Moines, Iowa. Defendant First Republic Group, L.L.C., was represented by Steven E. Mellen of Winget, Spadafora & Schwartzberg, L.L.P., in New York, New York. Defendant Evan Parks was represented by Thomas Reavely of Whitfield & Eddy, P.L.C., in Des Moines, Iowa.

The court found the parties' briefs and oral arguments unusually thorough and illuminating. The defendants' Motion For Summary Judgment is now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v.*

*Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

17

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the

benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

With these standards in mind, the court will consider whether or not First Republic is entitled to summary judgment on Baber's claims.

## B. The Breach Of Duty Claims

In its Motion For Summary Judgment, the defendants first challenge Baber's claims in **Counts III**, **IV**, and **V**, the claims for breach of contract, breach of duty of good faith and fair dealing, and breach of fiduciary duty, respectively. The defendants contend that these claims all fail, as a matter of law, because Baber has presented no evidence of a contractual or other duty obligating First Republic or Parks to charge commissions pursuant to any particular standard and that there is no basis on which Baber can obtain an after-the-fact judicial determination of the "reasonableness" of any fees. The court will consider these and more specific arguments concerning each "breach of duty" claim in turn.

### 1. Breach of contract

In **Count III** of his Second Amended Complaint, Baber alleges breach of contract by First Republic (only) based on an allegation that the parties had an agreement under which First Republic would provide brokerage services for a "reasonable" fee, but First Republic breached that agreement by charging, without Baber's knowledge or consent, unreasonable charges in the form of improper mark ups and mark downs to execute buy and sell orders in Baber's account. First Republic seeks summary judgment on this claim, which Baber resists.

### a. Arguments of the parties

First Republic argues that Baber has failed to point to any document or oral conversation reflecting an agreement to provide brokerage services for a "reasonable" fee. First Republic contends, to the contrary, that Baber's deposition testimony shows that, as

a matter of law, the parties had no such agreement. First Republic argues that, in the absence of a written or oral contract regarding the commissions that Baber would be charged by First Republic for its services, Baber's breach-of-contract claim fails as a matter of law.

Baber responds that First Republic appears to be arguing that it had the right to charge unreasonable and excessive commissions. Although Baber concedes that the parties never reached an agreement concerning the amount of commissions prior to the execution of a trade, he contends that, as a matter of state law, embodied in RESTATEMENT (SECOND) OF CONTRACTS § 204 and IOWA CODE § 554.2305, the court will supply a "reasonable" term for such an essential term of the parties' contract. He also contends that a "reasonable commissions" term is implied by Section 2440 of the NASD manual provided to each NASD member. Finally, he contends that First Republic's own policies require that a representative's commissions be "reasonable." Baber contends that, if First Republic's assertion that there was no contract for the charging of commissions is true, then First Republic had no legal right to charge any commission, which means that First Republic simply misappropriated funds from Baber's account.

In its Reply, First Republic argues that courts to consider the question have all agreed that the rules of exchanges like the NASD do not provide a private right of action for enforcement, nor does First Republic's policy manual (or "supervisory guidelines") provide for such a private right of action. First Republic argues that authorizing a cause of action based on a company's policy manual could create perverse incentives in the drafting of "house rules." First Republic also argues that Baber has relied on provisions of Iowa law that pertain to contracts for the sale of goods, not securities brokerage services, when he argues that the court should supply a "reasonable commissions" term. Finally, First Republic contends that Baber ratified any mark ups or mark downs by failing

to object to them in a timely manner, so that he cannot now complain that the mark ups or mark downs were "unreasonable."

### b. Analysis

To prove a breach-of-contract claim under Iowa law, the claimant must prove the following elements: (1) the existence of a contract between the parties; (2) the terms and conditions of the contract; (3) the claimant performed all the terms and conditions required under the contract; (4) the opposing party breached the contract in some particular way; and (5) the claimant suffered damages as a result of the breach. *See, e.g., Kaydon Acquisition Corp. v. Custum Mfg., Inc.*, 317 F. Supp. 2d 896, 912 (N.D. Iowa 2004) (citing, *e.g.*, *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). "'A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract.'" *Id.* (quoting *Molo Oil Co.*, 578 N.W.2d at 224, in turn citing *Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 27 (Iowa 1997)). First Republic argues that Baber's breach-of-contract claim fails on the first, second, and fourth elements, because Baber cannot show that there was any contract requiring First Republic to charge only a "reasonable" commission, so that no such contract was breached.

Under Iowa law, a contract can be either *express* or *implied*, but an express contract and an implied contract cannot coexist with respect to the same subject matter, and the law, therefore, will not imply a contract where there is an express contract. *See Union Pac. R. Co. v. Cedar Rapids and Iowa City R. Co.*, 477 F. Supp. 2d 980, 997 (N.D. Iowa 2007) (citing cases). In this case, Baber concedes that there was no *express* contract concerning "reasonable" commissions, so the court turns to whether or not Baber can show that there was an *implied* contract concerning "reasonable" commissions.

This court has defined an "implied in fact" contract, under Iowa law, as follows:

> The Iowa Court of Appeals has explained, "'When the parties manifest their agreement by words, the contract is said to be express,'" but "when there 'is merely a tacit promise, one that is inferred in whole or in part from expressions other than words on the part of the promisor,' it is said to be implied in fact." *Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000) (quoting CORBIN ON CONTRACTS § 1.18, at 51). The Iowa Court of Appeals has also explained that an "implied in fact" contract . . . "arises from the conduct of the parties, not merely from their relationship, and requires an expression of assent." *Irons v. Community State Bank*, 461 N.W.2d 849, 855 (Iowa Ct. App. 1990).

*Union Pac. R. Co.*, 477 F. Supp. 2d at 998. The question here is whether the conduct of the parties gives rise to an implied contract pursuant to which First Republic was obligated to charge only "reasonable" commissions and, more specifically, only "reasonable" mark ups and mark downs.

Certainly, First Republic could argue here, from the conduct of the parties, that there was an implied contract pursuant to which First Republic was entitled to *some* commission for providing brokerage services to Baber. Such a contention would fit neatly into the rubric of a *quantum meruit* implied-in-fact contract claim, which would require First Republic to show the following: (1) that its brokerage services were carried out under such circumstances as to give the recipient, Baber, reason to understand (a) that those services were performed for him and not some other person, and (b) that those services were not rendered gratuitously, but with the expectation of compensation from Baber; and (2) that the services were beneficial to Baber. *See, e.g., id.* at 999 (identifying these elements of a *quantum meruit* implied-in-fact contract claim, citing *Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 652 (Iowa 2004); *Iowa Waste Sys., Inc.*, 617

N.W.2d at 30; and *Scott v. Grinnell Mut. Reins. Co.*, 653 N.W.2d 556, 562 (Iowa 2002)). There is at least a jury question on each of these elements. Indeed, Baber has only argued that First Republic was not entitled to *any* commissions if there was no contract at all. More importantly, he testified that he assumed that First Republic would charge for transactions "like any other broker." By the same token, however, Baber contends that First Republic is impliedly entitled to receive only "reasonable" commissions, based on NASD rules, First Republic's own policies concerning charging "reasonable" commissions, and Iowa contract law allowing the court to imply a "reasonable" term when a material term is not expressly stated.

Baber is correct that Section 2440 of the NASD manual, which is provided to each NASD member, provides that a member "shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor." First Republic, however, is correct that courts have held that rules of commodity or stock exchanges do not provide a private cause of action for their enforcement. *See, e.g., Spicer v. Board of Options Exchange, Inc.*, 977 F.2d 255, 266 (7th Cir. 1992) (board of exchange's rules did not grant an implied right of action to investor who charged that an exchange member violated the board's rules); *Carrott v. Shearson Hayden Stone, Inc.*, 724 F.2d 821, 823 (9th Cir. 1984) (NYSE rules); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413, 1419 (11th Cir. 1983) (NYSE "know your customer" rule and NASD "suitability" rule). Thus, the NASD policy or rule on which Baber relies is not, in and of itself, an appropriate basis for implying a "reasonable commissions" term in the parties' implied agreement concerning brokerage services.

Similarly, the court is not convinced that the existence of a broker-dealer's internal policies requiring account representatives to charge "reasonable" commissions is necessarily the basis for an implied "reasonable commissions" agreement *between the broker-dealer and the investor*, although it might be the basis for an implied contract between the broker-dealer and the account representative that would make the charging of "reasonable" commissions a term or condition of the account representative's employment. The court will not address the interesting question of whether Baber can show that he is the third-party beneficiary of an implied contract *between First Republic and its representatives* arising from First Republic's policies requiring representatives to charge "reasonable" commissions, because the court concludes that Baber's implied contract claim is otherwise viable.

Specifically, as Baber points out, RESTATEMENT (SECOND) OF CONTRACTS § 204 provides, "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." The court concluded, above, that there would be at least a jury question as to whether First Republic and Baber had a "bargain sufficiently defined to be a contract" under which First Republic was entitled to *some* commissions for the brokerage services that it provided to Baber. The court now concludes, as a matter of law, that a term defining the amount of such commissions "is essential to a determination of [the parties'] rights and duties." RESTATEMENT (SECOND) OF CONTRACTS § 204. Thus, the court may supply "a term which is reasonable in the circumstances." *Id.* In this case, "a term which is reasonable in the circumstances" would be a term that any commissions, or mark ups or mark downs, charged by First Republic for its services must be "reasonable" under the circumstances of each transaction.

The court rejects First Republic's argument that the court cannot imply a "reasonable commissions" term, where no term relating to commissions has been expressly stated, simply because the parties' transaction involved services rather than goods. The Iowa Supreme Court relied, in part, on RESTATEMENT (SECOND) OF CONTRACTS § 204 to conclude that "[t]here may be an implied contract . . . on a point not covered by the expressed contracts" in a case involving obligations under loan agreements, *see Taylor Enters., Inc. v. Clarinda Production Credit Ass'n*, 447 N.W.2d 113, 116 (Iowa 1989), so that the principle stated in § 204 is not confined to "goods" contracts.[2] Thus, the court finds that there is a basis in this case for an implied contract to charge only "reasonable" commissions, mark ups, and mark downs.

First Republic also argues that Baber ratified the reasonableness of the commissions, mark ups, and mark downs that he was charged by failing to object to those charges at the time that he received the confirmation slips or even after he received a spreadsheet from his UBS broker setting forth the mark ups and mark downs that he had been charged on various transactions in his First Republic account, so that Baber cannot now assert a claim for breach of contract by charging "unreasonable" commissions. As the Iowa Supreme Court has explained, the elements of ratification—which must be proved by clear and convincing evidence—are the following: (1) existence of a principal; (2) an act done as an agent; (3) the principal's full knowledge of material facts; and (4) the express or

---

[2]In contrast, the court agrees with First Republic that IOWA CODE § 554.2305, on which Baber also relies, cannot be the basis for implying a "reasonable commissions" term here, because § 554.2305 is part of Iowa's codification of Article 2 of the Uniform Commercial Code, which by its terms applies only to transactions in goods. *See* IOWA CODE § 554.2102; *Speight v. Walters Dev. Co., Ltd.*, 744 N.W.2d 108, 116 (Iowa 2008) ("Article 2 of the UCC applies only to transactions involving the sale of goods.") (citing IOWA CODE § 554.2102).

implied intent of the principal to ratify the acts of the agent. *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 179 (Iowa 1987) (citing *Abodeely v. Cavras*, 221 N.W.2d 494, 502 (Iowa 1974)). Thus, there must be clear and unequivocal adoption of the challenged conduct by the principal. *Id.* The short answer to First Republic's argument that Baber "ratified" the mark ups and mark downs in this case is that there are jury questions as to whether Baber understood at the time of the transactions that he was being charged the allegedly unreasonable mark ups and mark downs, *id.* (third element), such that his failure to complain about them at the time constitutes ratification, *id.* (fourth element), and also a jury question as to whether Baber unreasonably failed to complain about what he considered unreasonable mark ups and mark downs when he did learn what his confirmation slips and monthly statements showed, thereby ratifying the charges. *Id.* (fourth element).[3]

Thus, the remaining question is, what is a commission that is "reasonable" under the circumstances of each transaction? Both the NASD rule and company policies shed light on factors relevant to answering that question. Moreover, for the reasons discussed more fully in reference to Baber's fraud claims, *see, infra*, beginning at page 50, relevant factors to determine whether a mark up or mark down is reasonable or excessive include, among others, the following: (1) the best judgment of the broker or dealer as to the fair market value of the securities at the time of the transaction; (2) the expense involved in effecting the transaction; (3) the fact that the broker or dealer is entitled to a reasonable profit; (4) the expertise provided by the broker or dealer; (5) the total dollar amount of the transaction; (6) the availability of the security in the market; (7) the price or yield of the

_____

[3]The court will consider the defendants' contention that Baber "ratified" the mark ups and mark downs in more detail in reference to Baber's "misappropriation/theft" claim, *infra*, beginning on page 44.

security; (8) the resulting yield after the subtraction of the mark up compared to the yield on other securities of comparable quality, maturity, availability; (9) the risk and the role played by the broker or dealer; and (10) the nature of the professional's business. There are at least jury questions as to whether the mark ups and mark downs charged to Baber are "reasonable" in light of these factors.

For the foregoing reasons, the court concludes that First Republic is not entitled to summary judgment on Baber's breach-of-contract claim in **Count III** of his Second Amended Complaint.

### 2.    *Breach of duty of good faith and fair dealing*

In **Count IV** of his Second Amended Complaint, Baber alleges breach of the duty of good faith and fair dealing by First Republic (only) based on allegations that First Republic charged him, without his knowledge or consent, unreasonable charges in the form of improper mark ups and mark downs to execute buy and sell orders in his account. First Republic also seeks summary judgment on this claim, which Baber resists.

### a.    *Arguments of the parties*

In support of its motion for summary judgment on this claim, First Republic argues that a necessary precondition to a claim of breach of the duty of good faith and fair dealing is the existence of an actual contract. First Republic then argues that, for the same reasons it asserted in relation to the breach-of-contract claim in **Count III**, Baber has failed to demonstrate the existence of a contract regarding commissions charged to him by First Republic. In the absence of such a contract, First Republic argues that a claimant cannot use a "duty of good faith" theory to create a "reasonable commissions" contract term by the "back door."

Baber counters that, also for the reasons stated in relation to **Count III**, he did have a contract requiring "reasonable" commissions, so that First Republic was required to

perform that contract in good faith. He argues that First Republic breached its duty of good faith and fair dealing in the following ways: secretly charging excessive and unreasonable mark ups and mark downs; charging maximum mark ups and mark downs for simple trades on stock exchanges; charging mark ups and mark downs in excess of the company guidelines and NASD rules; charging him commissions six times the trigger point for internal review by First Republic's compliance officers; charging him commissions over a two-year period that virtually equaled the value of his entire account; and acknowledging that Parks was charging excessive commissions in his account and restricting Parks from charging such commissions to other customers, but refusing to return the overcharges to him.

In reply, First Republic reiterates that Baber has failed to demonstrate the underlying contract on which his breach-of-good-faith claim depends. First Republic also contends that Baber is simply trying to impose a nebulous general requirement to act "reasonably," which exceeds the scope of a covenant of good faith under Eighth Circuit law. In short, First Republic argues that Baber is improperly attempting to turn a claim for breach of the duty of good faith and fair dealing into a cause of action for "overcharging."

### b.      *Analysis*

As this court has explained,

> Under Iowa law, a covenant of good faith and fair dealing is implied in every contract, imposing on each party to the contract a duty of good faith and fair dealing in the performance and enforcement of that contract. *See Engstrom v. State,* 461 N.W.2d 309, 314 (Iowa 1990); *Horton v. Uptown Partners, L.P.,* No. 05-0982, 2006 WL 1279044, at *3 (Iowa Ct. App. May 10, 2006) (table opinion); *Vlieger v. Farm for Profit, Research and Dev., Inc.,* 705 N.W.2d 339,

2005 WL 1963002, *3 (Iowa Ct. App. Aug.17, 2005) (table opinion); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 205, at 99 (1981). The Iowa Court of Appeals recently noted that:

> "The underlying principle is that there is an implied covenant that neither party [to a contract] will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."

*Horton,* No. 05-0982, 2006 WL 1279044, at *3 (quoting 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 38:15, at 437 (4th ed. 1999)).

*Kopple v. Schick Farms, Ltd.*, 447 F. Supp. 2d 965, 981 (N.D. Iowa 2006). In *Kopple,* this court held that, because the plaintiff had failed as a matter of law to demonstrate the existence of either an oral or written contract between the parties, the plaintiff's claim of breach of an implied covenant of good faith and fair dealing likewise failed as a matter of law. *Id.* at 982. Here, however, the court has found that Baber has, at the very least, generated genuine issues of material fact on the existence of an implied contract for "reasonable" commissions. Therefore, First Republic is not entitled to summary judgment on Baber's claim of breach of the duty of good faith based on the ground that First Republic originally asserted, Baber's purported failure to prove the underlying contract.

First Republic also argues that Baber is improperly using a claim of breach of the covenant of good faith and fair dealing to impose a "reasonableness" standard on commissions or to assert an "overcharging" claim. As this court also noted in *Kopple,* the covenant of good faith and fair dealing "is breached when a party to a contract acts in a manner that is offensive to 'community standards of decency, fairness and reasonableness.'" *Id.* (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982), in turn citing RESTATEMENT (SECOND) OF CONTRACTS § 205, cmt. a, at

100 (1981)).  The court finds that a reasonable juror could find that the conduct that Baber alleges violated the covenant "is offensive to community standards of decency, fairness, and reasonableness." *Id.* (internal quotation marks and citations omitted).  Moreover, as this court also explained above, "[t]he underlying principle is that there is an implied covenant that neither party [to a contract] will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Horton,* 2006 WL 1279044 at *3, in turn quoting 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 38:15, at 437 (4th ed. 1999)).  A reasonable juror could find that charging mark ups and mark downs over a two-year period that approximately equaled the total value of the investor's account destroyed or injured the right of the investor to receive the fruits of the contract, that is, growth of the account. *Id.*[4]

Therefore, First Republic is not entitled to summary judgment on Baber's claim of breach of the covenant of good faith and fair dealing in **Count IV** of his Second Amended Complaint.

### 3.    *Breach of fiduciary duty*

In **Count V** of his Second Amended Complaint, Baber alleges breach of fiduciary duty by both First Republic and Parks based on allegations that the defendants abused superior knowledge, trust, and confidence by charging, without Baber's knowledge or consent, unreasonable charges in the form of improper mark ups and mark downs to execute buy and sell orders in Baber's account.  The defendants have moved for summary judgment on this claim, and Baber resists.

---

[4]The court finds it unnecessary to take a position on whether Baber's other allegations of breach of the duty of good faith are sufficient, either separately or collectively, to sustain his claim, because, for the reasons stated, the court has found sufficient genuine issues of material fact to warrant presenting the claim to a jury.

### a. *Arguments of the parties*

In support of their motion for summary judgment on this claim, First Republic and Parks argue that the general rule is that a securities broker does not owe a fiduciary duty to a customer in a "nondiscretionary" account relationship, *i.e.*, in an account relationship in which the broker does not have the discretion to make trades in the customer's account without the customer's direction, and that there can be no genuine issue of material fact that Baber's account was "nondiscretionary," because Baber admits that, with only one possible exception, he approved all purchases and sales in his account, and he was an experienced investor. Even supposing that they owed Baber a fiduciary duty, the defendants contend that they are aware of no authority that the fiduciary duty owed to a brokerage customer includes a duty to set commissions according to a particular schedule or a judicial determination of "reasonableness."

Baber counters that, under Eighth Circuit precedent, whether the account in question is discretionary or nondiscretionary is only one factor in a court's determination of whether a broker owes an investor a fiduciary duty. Moreover, he argues that fiduciary duty is a matter of state law. Although he admits that he has not found any Iowa case or statute holding that a stock broker owes an investor a fiduciary duty, he argues that Iowa courts have imposed a fiduciary duty on comparable actors, such as real estate brokers, and that the Eighth Circuit Court of Appeals has noted that there is no significant difference between real estate brokers and securities brokers as to fiduciary duties. Even if there is no general fiduciary duty between a broker and an investor, Baber argues that the circumstances here are sufficient to create such a duty, because of the relationship of confidence and trust between himself and First Republic. More specifically, he argues that he placed his trust in Parks, he thought that Parks was a very persuasive talker, and Parks has admitted that Baber placed his trust in him; he usually followed Parks's

recommendations and entrusted large sums of money to Parks; and he is an aging gentleman who was influenced by Parks's dominance and persuasiveness. Thus, he contends that he has generated genuine issues of material fact on this claim.

In reply, the defendants contend that Baber has not identified any unusual facts in this broker-investor relationship that might serve to overcome the presumption that there was no fiduciary duty. Indeed, they contend that Baber offers nothing more than "vanilla" or "boilerplate" allegations of a fiduciary relationship. Also, in light of Baber's extensive investment experience, the defendants contend that there is no evidence that he occupied a significantly different status from other customers with nondiscretionary accounts. The defendants also contend that Baber has not demonstrated that, even if they owed him a fiduciary duty, that duty extended to such arm's-length matters as setting commissions.

### b.    *Analysis*

As this court has explained, under Iowa law, "[t]o establish a breach of fiduciary duty, the plaintiff must demonstrate the following elements:  (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached this fiduciary duty; (3) the breach of the fiduciary duty was a proximate cause of the plaintiff's damages; and (4) the amount of damages. *Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1108-09 (N.D. Iowa 2005) (citing *Top of Iowa Co-op. v. Schewe,* 149 F. Supp. 2d 709, 717 (N.D. Iowa 2001)).  In their motion for summary judgment, the defendants challenge the existence of any fiduciary duty in this case and the existence of any evidence that there was a breach of a duty within the scope of any fiduciary duty that may have existed.

### i.    *Existence of a fiduciary duty*.  The defendants contend, first, that a broker does not owe a fiduciary duty to an investor, such as Baber, who has a "nondiscretionary" account.  The Eighth Circuit Court of Appeals rejected such a contention more than a decade-and-a half ago in *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d

1206 (8th Cir. 1990).  In *Davis*, the court concluded that "[w]hether an account is discretionary or nondiscretionary is only one factor [courts] examine in determining whether a securities broker owes a fiduciary duty to his or her customers." *Davis*, 906 F.2d at 1216.  Thus, it is important to examine the entire broker-customer relationship, rather than merely the status of the account.  *Id.*

Moreover, in *Davis*, the court explained that "[t]he question of whether a fiduciary relationship exists is a question of state law."  *Id.* at 1215.  As this court subsequently explained,

> [T]he Iowa Supreme Court has defined a fiduciary duty as follows:
>> "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)).  We have also noted that
>>> a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind. . . .  The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done.  [The] [p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."
>> *Hoffmann v. Nat'l Med. Enters., Inc.,* 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman,* 253 Iowa 631, 113 N.W.2d 254, 256 (1962)). . . .
>> . . . . [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be

evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696.
*Oeltjenbrun v. CSA Investors, Inc.,* 3 F. Supp. 2d 1024, 1053 (N.D. Iowa 1998) (quoting *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* 522 U.S. 810, 118 S. Ct. 52, 139 L. Ed. 2d 17 (1997)); *see also Gunderson,* 85 F. Supp. 2d at 920-21 (quoting *Oeltjenbrun* ); *Corcoran v. Land O'Lakes, Inc.,* 39 F. Supp. 2d 1139, 1154 (N.D. Iowa 1999) (quoting *Oeltjenbrun* ). These sentiments are echoed in the Iowa Model Civil Jury Instructions, which direct that

> . . . a fiduciary relationship is a relationship of trust and confidence on a subject between two persons. One of the persons is under a duty to act for or give advice to the other on that subject. Confidence is placed on one side, and domination and influence result on the other.

> Circumstances that may give rise to the existence of a fiduciary relationship include the acting of one person for another, the having and exercising of influence over one person by another, the placing of confidence by one person in another, the dominance of one person by another, the inequality of the parties, and the dependence of one person upon another. None of these circumstances is more important than another. . . .

Iowa Model Civil Jury Instructions 3200.2 (2002); *see also Top of Iowa Co-op.,* 149 F. Supp. 2d at 718 (with regard to existence of a fiduciary relationship, instructing the jury, in part, that "[a] fiduciary relationship can therefore exist when the evidence indicates that (1) one of the parties enjoyed superior or excessive influence over the other; (2) the parties had a confidential relationship and one of the parties had greater access to facts and legal resources; or (3) there was a disparity of business experience and an invitation to the party with lesser experience to place confidence in the advice of the other party"). Ultimately, under Iowa law, the "'circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and

35

circumstances of the individual case.'" *Economy Roofing &
Insulating Co. v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995)
(quoting *Kurth,* 380 N.W.2d at 696).

*Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1108-09 (N.D. Iowa 2005).

In *Davis*, in which the court applied South Dakota law to a breach of fiduciary duty
claim by an investor against a securities broker, the court noted that the parties had not
identified any South Dakota cases or statutes deciding whether a fiduciary relationship
exists between a securities broker and his or her customers, but that the South Dakota
Supreme Court had held that real estate brokers owe a fiduciary duty to their clients.
*Davis*, 906 F.2d at 1215.  The court then reasoned as follows:

> The [court in *Hurney v. Locke*, 308 N.W.2d 764 (S.D. 1981),]
> reasoned that a fiduciary duty should be imposed on real estate
> agents or brokers because "[a] real estate agent is a licensed
> professional holding himself out as trained and experienced to
> render a specialized service . . .  Clients rely on the agent's
> expertise and expect the agent to act in their best interests."
> *Id.* [at 768] (citation omitted).  Likewise, securities brokers
> such as Marks and Ulrich at Merrill Lynch are "licensed
> professional[s] holding [themselves] out as trained and
> experienced to render a specialized service."  *Id.*  Like the
> clients of real estate agents, securities customers "rely on the
> agent's expertise and expect the agent to act in their best
> interests."  *Id.*  Because we see no significant difference
> between real estate brokers and securities brokers, we believe
> that if confronted with the question, the South Dakota Supreme
> Court would find that securities brokers are fiduciaries that
> owe their customers "a duty of utmost good faith, integrity and
> loyalty."  *Id.*

*Davis*, 906 F.2d at 1215.  Consequently, the court in *Davis* held that the district court did
not abuse its discretion in instructing the jury that a fiduciary relationship exists between
licensed securities brokers and their customers.  *Id.*

Similarly, Baber has pointed to decisions of the Iowa Supreme Court holding that a real estate broker owes a fiduciary duty to his customer. *See Garren v. First Realty, Ltd.*, 481 N.W.2d 335, 337 (Iowa 1992); *Menzel v. Morse*, 362 N.W.2d 465, 474 (Iowa 1985). This court, like the Eighth Circuit Court of Appeals, "see[s] no significant difference between real estate brokers and securities brokers," so that this court also "believe[s] that if confronted with the question, the [Iowa] Supreme Court would find that securities brokers are fiduciaries that owe their customers [a fiduciary duty]." *Davis*, 906 F.2d at 1215. To put it more explicitly, there is no doubt that First Republic and Parks were under a duty to act for or to give advice for the benefit of Baber upon matters within the scope of their broker-investor relationship. *Oeltjenbrun*, 3 F. Supp. 2d at 1053 (citing *Willson*, 558 N.W.2d at 138). First Republic and Parks were authorized to act on Baber's behalf to make trades in his account, even if they were only to make the trades that Baber expressly authorized; Parks had and exercised influence over Baber, and Baber placed confidence in Parks, as shown by Baber's acting on Parks's advice and Baber's observation that Parks was a "very persuasive talker"; and despite Baber's extensive investment experience, there was an inequality of the parties with regard to information about investments and how transactions were effectuated and a dependence by Baber on Parks (and First Republic) to advise him about investment choices, where Baber has testified that he had no experience with mark ups or mark downs. *Schuster*, 378 F. Supp. 2d at 1108-9 (noting these indicia of a fiduciary relationship from Iowa Model Civil Jury Instructions 3200.2 and *Top of Iowa Co-op*, 149 F. Supp. 2d at 718).

In *Davis*, the Eighth Circuit Court of Appeals held that, in comparable circumstances, the district court had not erred in instructing that a fiduciary duty exists between securities brokers and their customers, rejecting the defendant broker's contention that the district court should have required the jury to make certain factual findings before

37

finding a fiduciary relationship. 906 F.2d at 1215-17. Following *Davis*, this court finds, as a matter of law, that First Republic and Parks owed Baber a fiduciary duty. *Id.*

Consequently, First Republic and Parks are not entitled to summary judgment on Baber's claim of breach of fiduciary duty in **Count V** on their first ground, that no fiduciary duty existed.

*ii.*     *Scope of the duty*. In the alternative, First Republic and Parks argue that, even if they owed Baber a fiduciary duty, that duty did not extend to such arm's-length matters as setting commissions. In their reply, the defendants contend that Baber has not responded to this argument. Although the court agrees that Baber made no explicit response to this argument, it is nevertheless clear—among other things from Baber's reliance on *Davis*, 906 F.2d at 1215, which states the applicable duty—that Baber asserts that the fiduciary duty in question required the defendants to act with the utmost good faith, integrity, and loyalty, but that they breached such a duty by charging excessive and secret mark ups and mark downs in a self-serving scheme that defeated the investment objectives of his account.

As explained above, the purpose of the fiduciary duty doctrine "is to defeat and protect betrayals of trust and abuses of confidence." *Schuster*, 378 F. Supp. 2d at 1108 (internal quotation marks and citations omitted). Thus, a fiduciary relationship requires the fiduciary to act for or to give advice for the benefit of the dependent party upon matters within the scope of the relationship. *Id.* More specifically, under Iowa law, a duty of loyalty is a fiduciary duty. *See Cookies Food Prods., Inc. v. Lakes Warehouse Distributing, Inc.*, 430 N.W.2d 447, 451 (Iowa 1988) (corporate fiduciary). The fiduciary must also act in the best interests of the dependent party. *See, e.g.,* IOWA CODE § 490.830(1) (fiduciary duty of a director to a corporation). A fiduciary must also avoid self-dealing that is to the detriment of the dependent party. *See, e.g.,* IOWA CODE

§ 633.155 (duty of fiduciary for an estate). Thus, the Iowa Supreme Court has found a breach of fiduciary duty, for example, where an attorney's conduct reflected self-dealing, dishonesty, total willingness to compromise the interests of his client, and absolutely no remorse. *See Iowa Supreme Court Bd. of Professional Ethics and Conduct v. Remer*, 646 N.W.2d 91, 96 (Iowa 2002).

The decision of the Eighth Circuit Court of Appeals in *Davis* also presents a more specific example of the scope of the fiduciary duty owed by a broker to a customer. 906 F.2d at 1215. In *Davis*, the court upheld a verdict for an investor on a claim that her broker had breached its fiduciary duty by "churning" the customer's account, that is, directing the volume and frequency of trades for personal gain by initiating transactions that were excessive in view of the character of the account and the customer's objectives as expressed to the broker, and thereby abusing the customer's confidence. *Id.* at 1211 n.3 (defining "churning"); *id.* at 1215-17 (finding jury instructions proper and upholding a jury verdict on a breach of fiduciary duty claim). If "churning" an account for the broker's personal gain—presumably by generating excessive commissions—is a breach of fiduciary duty, this court has no hesitation in concluding that charging, but failing to disclose, excessive mark ups or mark downs for the broker's personal gain, as Baber has alleged and a reasonable juror could find, would also be an abuse of a customer's confidence and a betrayal of trust. *See Schuster*, 378 F. Supp. 2d at 1108 (the purpose of the fiduciary duty doctrine "is to defeat and protect betrayals of trust and abuses of confidence") (internal quotation marks and citations omitted). A reasonable juror could also find that such conduct reflected self-dealing, dishonesty, and a total willingness to compromise the interests of the broker's client, and that repeated instances of such conduct suggest a lack of remorse. *Cf. Remer*, 646 N.W.2d at 96 (finding such conduct by an attorney was a breach of fiduciary duty). Finally, Baber has generated genuine issues of

material fact on one incident of unauthorized trading in his case, the unauthorized sale of P.F. Chang stock, on which First Republic and Parks charged a mark down, followed by the purchase of that stock to correct the "mistake," on which First Republic and Parks also charged a mark up. Under *Davis*, 906 F.2d at 1215-17, that incident, standing alone, is sufficient to present Baber's breach-of-fiduciary-duty claim to a jury.

Consequently, First Republic and Parks are not entitled to summary judgment on Baber's claim of breach of fiduciary duty in **Count V** on their alternative ground, that no fiduciary duty was violated.

## C. The Theft And Fraud Claims

### 1. The claims at issue

First Republic and Parks also seek summary judgment on **Counts I**, **II**, **VI**, and **VII**, of Baber's Second Amended Complaint, which allege claims of "misappropriation/theft" and "fraud." More specifically, in **Count VI** of his Second Amended Complaint, Baber alleges "[m]isappropriation/[t]heft of [f]unds," based on allegations that, without Baber's knowledge or consent, the defendants misappropriated and diverted to their own use $147,021 from Baber's brokerage account with First Republic. In **Counts I**, **II**, and **VII**, Baber asserts common-law and statutory fraud claims. These claims are as follows: **Count I** alleges "common law fraud" by both defendants, based on an allegation that the defendants knowingly and intentionally made false representations regarding stock prices and the amount of fees they were charging and concealed improper mark ups and mark downs, thereby diverting funds to themselves; **Count II** alleges "[v]iolation of Iowa Securities Act" by both defendants by engaging in the same conduct at issue in **Count I** and by recommending and inducing Baber to enter into stock transactions that were not suitable for him; and **Count VII** alleges "[v]iolation of Federal

Securities Laws" by knowingly and intentionally making false representations regarding stock prices and the amount of fees being charged by the defendants and by concealing improper mark ups and mark downs that diverted funds to the defendants.

### 2. *Arguments of the parties*

The parties do not differentiate among Baber's various "misappropriation/theft" and "fraud" claims. Rather, the defendants contend that all of these claims suffer from the same fundamental flaw, which is that there is no genuine issue of material fact that the challenged mark ups or mark downs were disclosed to Baber. Baber denies that the defendants are entitled to summary judgment on these claims, because he asserts that the defendants disclosed the mark ups and mark downs only in a way that was confusing and misleading.

In the alternative, the defendants argue that the record shows that the alleged overcharges were not material, because even after learning about the allegedly excessive mark ups and mark downs, Baber continued to do business with First Republic and Parks. Baber counters that Parks was a "very persuasive talker" and that, in any event, no mark ups or mark downs were charged on any of the trades he made in his First Republic account after he discovered the mark ups and mark downs in December 2004.

### 3. *The "misappropriation/theft" claim*

#### a. *Nature of the claim*

Although the parties make no separate argument about Baber's "misappropriation/theft claim" in **Count VI**, the court nevertheless finds that this claim requires separate analysis. The parties have cited no authorities, Iowa or otherwise, defining a civil cause of action for "misappropriation," and the court has found none. The court has, however, discovered Iowa decisions explaining that "[t]he civil equivalent of a theft prosecution is an action for conversion." *State v. Taylor*, 506 N.W.2d 767, 768

(Iowa 1993); *accord State v. Hollinrake*, 608 N.W.2d 806, (Iowa Ct. App. 2000) (citing *Taylor*). Iowa courts have also repeatedly described the conduct giving rise to a claim for "conversion" of funds—which is what Baber has alleged here by alleging that the defendants "diverted" funds from his account—as "misappropriation" of funds. *See, e.g., Iowa Supreme Court Attorney Disciplinary Bd. v. D'Angelo*, 710 N.W.2d 226, 236 (Iowa 2006); *State v. Bonstetter*, 637 N.W.2d 161, 168-69 (Iowa 2001). Thus, the court concludes that the claim in **Count VI** is properly described and analyzed as a "conversion" claim.

As to the tort of "conversion," the Iowa Court of Appeals has explained,

> Conversion is the intentional exercise of control over property "which so seriously interferes with the right of another to control it that the actor may justly be required to pay . . . the full value of the chattel." *Restatement (Second) of Torts* § 222A(1) (1964). Conversion may be committed by obtaining the chattel through fraud or by using a chattel, properly within one's control, in an unauthorized manner. *Id.* §§ 221(b), 228. Not only must [the defendant's] actions meet the elements of conversion, but there must also be a causal connection between his actions and the damage to the victim. *See State v. Ihde*, 532 N.W.2d 827, 829 (Iowa App.1995). Finally, the damages sought must be compensable under the law. Normally, expenses incurred in preparation of trial are not recoverable. *Taylor*, 506 N.W.2d at 768. In conversion cases, however, "the reasonable and necessary expenses incurred in recovering the property are a proper element of damage." *Id.*

*Hollinrake*, 608 N.W.2d at 808-09. In *Hollinrake*, the court also explained that "conversion" can be accomplished by "permanently dispossess[ing]" the claimant of the funds, but clarified that "[c]onversion only requires intentional dispossession; it does not contemplate the actor's motivation," *i.e.*, it does not require proof of an intent to defraud. *Id.* at 809. Just as the civil cause of action for "conversion" does not require proof of the

actor's motivation, the Iowa Supreme Court has concluded that the criminal offense of "theft by misappropriation," defined by IOWA CODE § 714.1(2), does not require proof of "intent to defraud." *Eggman v. Scurr*, 311 N.W.2d 77, 80 (Iowa 1981) (answering certified question from the United States District Court for the Northern District of Iowa).[5] This explanation of the limits of the "intent" requirement for the "misappropriation" or "conversion" claim alleged in **Count VI** is significant here, because that claim, thus, differs from the "fraud" claims also asserted by Baber in **Counts I, II,** and **VII**, among other things, in that it does not require proof of "intent to defraud."

  ***b. Analysis***

   One consequence of the conclusion that the alleged tortfeasor's motivation or "intent to defraud" is *not* an element of a "conversion" claim is that First Republic's and Parks's first argument for summary judgment on this claim, that they disclosed the mark ups and

---

[5]The court finds that a "misappropriation" is defined, generally, as the "unauthorized, improper, or unlawful use of funds or other property for purposes other than that for which intended." BLACK'S LAW DICTIONARY (6th ed. 1990), 998. An Iowa statute defines the criminal offense of "theft by misappropriation" as follows:

> A person commits theft when the person does any of the following:
>
>   * * *
>
> 2. Misappropriates property which the person has in trust, or property of another which the person has in the person's possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner's rights in such property, or conceals found property, or appropriates such property to the person's own use, when the owner of such property is known to the person.

IOWA CODE § 714.1(2). These authorities confirm that "misappropriation" is a form of "theft," and these definitions of "misappropriation" are also comparable to the definition of "conversion" stated in the body of this decision. *See Hollinrake*, 608 N.W.2d at 809.

mark downs at issue, is inapposite. While disclosure might negate either a "non-disclosure" or an "intent to defraud" element of a "fraud" claim, a "conversion" claim requires only proof that the alleged tortfeasor intentionally and permanently "dispossessed" the claimant of the funds in question. *See Hollinrake*, 608 N.W.2d at 809 ("conversion" can be accomplished by "permanently dispossess[ing]" the claimant of the funds, but "[c]onversion only requires intentional dispossession; it does not contemplate the actor's motivation"). The record is more than adequate to generate genuine issues of material fact that First Republic and Parks intentionally and permanently dispossessed Baber of funds in his First Republic brokerage account by charging mark ups and mark downs to which Baber had not consented at all, or that were in excess of any consent that he may have given under an implied contract permitting "reasonable" charges. Moreover, the court finds that Baber's "conversion" claim would survive summary judgment on the basis of evidence that First Republic and Parks charged a mark down on the P.F. Chang trade that Baber alleges was not authorized, then charged a mark up when First Republic repurchased that stock to correct the "mistake." A reasonable juror could find that such conduct constituted intentionally and permanently dispossessing Baber of funds by means of a transaction for which there was no authorization in the first place, so that there was no implied contract permitting the defendants to charge any commission at all on either the original transaction or the "corrective" transaction. *Id.*

The defendants' second ground for summary judgment on Baber's "conversion" claim, that the mark ups and mark downs were not material, or that Baber later ratified the mark ups and mark downs charged, because he never complained about them, may be more apposite. "Ratification" appears to be an affirmative defense to a "conversion" claim. *Cf. Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 177 (Iowa 1987) ("ratification" was held to be a complete defense to a claim of conversion based on

unauthorized commodities trading); *but see Iowa Supreme Court Bd. of Professional Ethics and Conduct v. Allen*, 586 N.W.2d 383, 390 (Iowa 1998) (later court approval of unauthorized gifts to a conservator did not remove the impropriety of the earlier payments). As the Iowa Supreme Court has explained, the elements of ratification—which must be proved by clear and convincing evidence—are the following: (1) existence of a principal; (2) an act done as an agent; (3) the principal's full knowledge of material facts; and (4) the express or implied intent of the principal to ratify the acts of the agent. *Ellwood*, 404 N.W.2d at 179 (citing *Abodeely v. Cavras*, 221 N.W.2d 494, 502 (Iowa 1974)). Thus, there must be clear and unequivocal adoption of the challenged conduct by the principal. *Id*.

The defendants here assert that Baber at least impliedly ratified the mark ups and mark downs by First Republic and/or Parks, because he admits that he learned of them not later than December 2004, but he thereafter made no objection and, instead, engaged in further trades in his First Republic account. An alleged tortfeasor may be able to prove implied intent to ratify, for example, by showing that the claimant had specific knowledge of his right to disavow the unauthorized actions with no cost to himself, but nevertheless failed to act upon that knowledge. *Id*. at 180. However, a claimant's lack of sophistication or experience may be such that the claimant could not have ratified the transactions in question. *See id*.

Here, the record does demonstrate beyond dispute that Baber first learned that he was being charged mark ups and mark downs on some transactions in his First Republic account in December 2004, after he consulted his UBS broker about his First Republic trade confirmations and account statements and, moreover, that, by the spring of 2005, he knew the full extent of the mark ups and mark downs that his account had been charged, because his UBS broker provided him with a spreadsheet showing the dollar value of each

mark up or mark down that Baber had been charged in connection with his First Republic trades. There is also no genuine dispute that, notwithstanding the information provided by his UBS broker, Baber did not complain to Parks or have any discussion with him about mark ups or mark downs, nor did he have any conversation with any of Parks's supervisors.

Although the court would find such evidence very troubling, were the court the trier of fact, the court, nevertheless, believes that a reasonable juror could find that Baber lacked the experience or sophistication to respond to what he believed were excessive or unauthorized mark ups and mark downs, where the record indicates that he had no prior experience or understanding of mark ups and mark downs, even if he had fifty years of investment experience. *Id.* (a claimant's lack of sophistication or experience may be such that the claimant could not have ratified the transactions in question). In short, the court believes that a jury question is presented on whether Baber waited too long to complain about any of the mark ups or mark downs, so that his apparent acquiescence after he obtained full knowledge about such charges to his account unequivocally shows ratification of those charges. *Id.* (ratification must be clear and unequivocal, even if it is only implied). A jury question is also presented as to whether, after Baber learned of the allegedly excessive charges, Baber's making a few trades in his First Republic account on which no mark ups or mark downs were charged unequivocally shows ratification of such charges on prior trades. *Id.* The court concludes that Baber's age and Parks's persuasiveness, among other factors, are relevant to the question of whether Baber ratified the charges in question by conducting further trades, if a more sophisticated person in his position otherwise might not have done so. *Id.* (the experience and sophistication of the principal are relevant to the question of ratification). To put it another way, whether Baber's conduct shows that the mark ups and mark downs were not material or shows

ratification of those charges turns on the credibility of Baber's explanation for his conduct, a matter that properly belongs to a jury to determine on a full record.

Therefore, the court concludes that the defendants are not entitled to summary judgment on Baber's "misappropriation/theft" claim in **Count VI**, which the court has construed as a "conversion" claim.

### 4. The "fraud" claims

#### a. Nature of the claims

Baber has alleged three species of "fraud" claims: "common law fraud" in **Count I**; fraud in violation of the Iowa Securities Act in **Count II**; and fraud in violation of the Federal Securities Act in **Count VII**. The parties have not distinguished among these claims. Rather, the defendants have asserted "disclosure" and "ratification" challenges to these claims as a group, and Baber has responded in kind.

Nevertheless, the court finds it appropriate to consider, briefly, the nature of the three species of "fraud" claims at issue in this case. As this court has explained, the elements of a common-law fraud claim for damages under Iowa law are the following: (1) a representation by the opposing party; (2) falsity of the representation; (3) scienter (*i.e.*, knowledge of falsity); (4) intent to deceive; (5) materiality of the misrepresentation; and (6) justifiable reliance by the claimant upon the representation, resulting in injury to the claimant, but in the case of an alleged fraudulent non-disclosure or concealment, the first element is that the defendant concealed a material fact when under a legal duty to disclose that fact. *See, e.g., United States v. Hawley*, ___ F. Supp. 2d ___, 2008 WL 912886, *20 (N.D. Iowa April 3, 2008) (citing *McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*, 469 F. Supp. 2d 677, 705 & 707 (N.D. Iowa 2007), in turn citing *Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005)). Similarly, fraud in violation of § 10(b) and Rule 10b-5 of the Federal Securities Act requires proof of the following: (1) misrepresentations

or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security. *Schuster v. Anderson*, 413 F. Supp. 2d 983, 1009 (N.D. Iowa 2005) (citing *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1533-34 (8th Cir. 1996), and *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 1631 (2005)). The Iowa Uniform Securities Act includes three anti-fraud provisions that Baber alleges are at issue here. First, the "general fraud" provision, IOWA CODE § 502.501, prohibits any person, "in connection with the offer, sale, or purchase of a security, directly or indirectly" [1] "[t]o employ a device, scheme, or artifice to defraud; [or] [2] [t]o make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or [3] [t]o engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person." Second, the provision defining "prohibited transactions of broker-dealers and agents," IOWA CODE § 502.501A, states, in pertinent part, that it is unlawful for such persons to "effect a transaction in, or induce or attempt to induce the purchase or sale of, any security in this state by means of any manipulative, deceptive, or other fraudulent scheme, device, or contrivance, fictitious quotation, or in violation of this chapter." Finally, the provision defining "prohibited conduct in providing investment advice," IOWA CODE § 502.502, prohibits "a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities to do any of the following: [1] [e]mploy a device, scheme, or artifice to defraud another person[;] [and] [2] [e]ngage in an act, practice, or course of business that operates or would operate

as a fraud or deceit upon another person." The court agrees with the parties' implicit contention that all three species of "fraud" at issue in this case have in common the "non-disclosure" and "intent to defraud" elements that the defendants challenge in their Motion For Summary Judgment.

For "non-disclosure" to be actionable as "fraud," however, there must be some duty to disclose the pertinent information. *See, e.g., Hawley*, ___ F. Supp. 2d at ___, 2008 WL 912886 at *20 ("non-disclosure" is actionable under Iowa common law, if there was a duty to disclose the information in question). As set out above, the federal and state statutes on which two of Baber's fraud claims are based also make actionable "omissions," "artifices to defraud," or "deceits," thereby giving rise to a duty to disclose material facts. *See Schuster*, 413 F. Supp. 2d at 1009 (elements of a fraud action under the Federal Securities Act); IOWA CODE §§ 502.501, 502.501A, 502.502.

More specifically, for present purposes, as to the requisite duty to disclose, some federal courts have recognized a "shingle theory" under the Federal Securities Act, under which "a securities dealer creates an implied duty to disclose excessive markups by 'hanging out its professional shingle." *Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 111 (2d Cir. 2005) (citing *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 192 (2d Cir. 1998)); *see also Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1034 (4th Cir. 1997); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1033 (3d Cir. 1987). "[U]nder the shingle theory and '§ 10(b) of the Exchange Act, [an exchange agent] has a duty to disclose the details of [its fee] if the [fee] is "excessive."'" *Starr*, 412 F.3d at 111 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2d Cir. 2000), with citation omitted). The duty, thus, is to "either not charge excessive markups [or mark downs] on securities transactions, or else to make sufficient disclosures so as to permit investors to make an

informed decision about the transaction.'" *Id.* (quoting *Grandon*, 147 F.3d at 192). If the broker-dealer "disclosed its fees, it cannot be said to have defrauded [the investor] simply because the fees were allegedly excessive." *Id.* The Second, Third, and Sixth Circuit Courts of Appeals have recognized a private right of action for fraud under § 10(b) and Rule 10b-5 under the "shingle theory" for charging undisclosed, excessive commissions. *Grandon*, 147 F.3d at 192-93 (citing *Ettinger*, 835 F.2d at 1036, and *Bank of Lexington & Trust Co. v. Vining-Sparks Securities Inc.*, 959 F.2d 606, 613 (6th Cir. 1992), and also citing *Banca Cremi*, 132 F.3d at 1035-36, as dictum, then recognizing such a private right of action). Although neither the Eighth Circuit Court of Appeals, in the context of the Federal Securities Act, nor the Iowa Supreme Court, in the context of either the Iowa Securities Act or the common law, has recognized the "shingle theory," this court finds that both courts would be likely to do so, if presented with the question, in light of the reasoning in the authorities cited just above. Thus, the court finds, as a matter of law, that First Republic and Parks were under a duty to disclose excessive mark ups and mark downs on transactions in Baber's First Republic account and that proof of failure to do so would constitute proof of "fraud" under state and federal securities laws and state common law.

The questions then become, what constitutes an "excessive" mark up or mark down that must be disclosed,[6] and what constitutes adequate disclosure of such mark ups or mark

---

[6]Although this question is not at issue on the defendants' motion for summary judgment, it will certainly be at issue if this matter proceeds to trial on Baber's "fraud" claims. As mentioned above, the determination of what constitutes an "excessive" mark up or mark down is also relevant to Baber's breach-of-contract claim, where the court has concluded that there are genuine issues of material fact on Baber's claim of an implied contract to pay "reasonable commissions" on the transactions in his First Republic
(continued...)

downs?  As to the first question, the Second Circuit Court of Appeals observed, "It appears to be agreed that markups for equity securities generally should not exceed five percent of the prevailing market price." *Grandon*, 147 F.3d at 191.  On the other hand, the Fourth Circuit Court of Appeals has recognized that, "Because the reasonableness of markups is situation-specific, the NASD guideline recognizes that markups of under five percent may be excessive." *Banca Cremi*, 132 F.3d at 1033 n.20 (citing 3C HAROLD S. BLOOMENTHAL, SECURITIES AND FEDERAL CORPORATE LAW, App. 12.13 (Apr. 1, 1992)). Ultimately, the Second Circuit Court of Appeals noted that relevant factors to determine whether a mark up or mark down is excessive include, among others, the following: (1) the best judgment of the broker or dealer as to the fair market value of the securities at the time of the transaction; (2) the expense involved in effecting the transaction; (3) the fact that the broker or dealer is entitled to a reasonable profit; (4) the expertise provided by the broker or dealer; (5) the total dollar amount of the transaction; (6) the availability of the security in the market; (7) the price or yield of the security; (8) the resulting yield after the subtraction of the mark up compared to the yield on other securities of comparable quality, maturity, availability; (9) the risk and the role played by the broker or dealer; and (10) the nature of the professional's business.  *Grandon*, 147 F.3d at 190 & 193 (relying, *inter alia*, on the Municipal Securities Rulemaking Board rules); *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 535 (2d Cir. 1999) (citing *Grandon*, but also expanding the list of relevant factors); *Banca Cremi*, 132 F.3d at 1033 (identifying similar factors, citing 3C HAROLD S. BLOOMENTHAL, SECURITIES AND FEDERAL

---

[6] (...continued)

account, and the court has noted that what constitutes such a "reasonable commission" will be informed, in part, by factors that determine what is an "excessive" or "unreasonable" fee within the meaning of the "fraud" claims. *See, supra*, page 27.

CORPORATE LAW, App. 12.13 (Apr. 1, 1992)).  Although the Second Circuit Court of Appeals found that the "fairness and reasonableness" determination is generally fact-based, it anticipated that there may be cases in which a trial court can properly conclude, as a matter of law, that the plaintiff failed to state a claim that the mark ups or mark downs were excessive.  *Id.* at 193.

As to the second question, what constitutes adequate disclosure, courts that have recognized the "shingle theory" have required, generally, that the disclosure be "'sufficient . . . so as to permit investors to make an informed decision about the transaction.'"  *Starr*, 412 F.3d at 111 (quoting *Grandon*, 147 F.3d at 192, in turn quoting *Ettinger*, 835 F.2d at 1033).  The Second Circuit Court of Appeals has held that, where the broker-dealer adequately disclosed the rate of the mark up or mark down *before the transaction*, and all that was required was for the stockholder "to perform the two-minute multiplication" of shares times the rate to ascertain the fee, there had been no "'omission' for which the law gives redress.'"  *Starr*, 412 F.3d at 111.  On the other hand, both the Federal Securities Act and the Iowa Securities Act prohibit disclosures that are "misleading."  *See In re Charter Communications, Inc., Sec. Litig.*, 443 F.3d 987, 990 (8th Cir. 2006) (defining manipulative or deceptive practices under § 10(b) of the Federal Securities Act as those intended to mislead investors); *In re K-tel Int'l, Inc., Sec. Litig.*, 300 F.3d 881, 904 (8th Cir. 2002) (an omission violates § 10(b) or Rule 10b-5 if it is necessary to prevent a voluntary statement from being misleading); IOWA CODE § 502.501 (prohibiting any person, "in connection with the offer, sale, or purchase of a security, directly or indirectly," *inter alia*, "to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading").  A disclosure that is misleading is also actionable on a common-law fraud theory.  *See Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159, 177 (Iowa 2002) (defining

a claim that a manufacturer failed to disclose material information or made misleading statements intended to influence consumers, citing RESTATEMENT (SECOND) OF TORTS § 551, which applies more generally to "business transactions"). Thus, a misleading disclosure will not satisfy the duty to disclose.

With the nature of the "fraud" claims more clearly delineated, the court turns to the question of whether First Republic and Parks are entitled to summary judgment on these claims on the grounds asserted.

### b.    Analysis

Because Baber's "fraud" claims do require proof of "non-disclosure," the defendants' first ground for summary judgment on these claims, that there is no genuine issue of material fact that the commissions and mark ups or mark downs were disclosed to Baber, is apposite to these claims, where it was not apposite to his "misappropriation/theft" claim. Contrary to the defendants' contentions, however, the court concludes that there are genuine issues of material fact as to whether the defendants' disclosure of the mark ups and mark downs they were charging were "'sufficient . . . so as to permit investors to make an informed decision about the transaction.'" *Starr*, 412 F.3d at 111 (quoting *Grandon*, 147 F.3d at 192, in turn quoting *Ettinger*, 835 F.2d at 1033). This is not, as the defendants contend, a case in which Baber was informed of the per share amount of each mark up or mark down, so that he merely had to multiply the mark up or mark down by the number of shares involved in the transaction to determine the "commission" that the defendants had charged on the transactions. First, there is no evidence that Baber was informed *prior to each transaction* of the per share amount of the mark up or mark down. *Cf. Starr*, 412 F.3d at 111 (where the broker-dealer adequately disclosed the rate of the mark up or mark down *before the transaction*, and all that was required was for the stockholder "to perform the two-minute multiplication" of shares

times the rate to ascertain the fee, there had been no "'omission' for which the law gives redress'"). Therefore, he could not make an informed decision *before each transaction* about that transaction. *Cf. id.* Rather, it is a case in which a reasonable juror could find that the disclosures of the mark ups and mark downs were made only after the fact and only in a manner that was likely to mislead or confuse an investor who, like Baber, at least arguably had no prior experience with mark ups or mark downs. *See In re Charter Communications, Inc., Sec. Litig.*, 443 F.3d at 990 (the Federal Securities Act prohibits conduct intended to mislead investors); IOWA CODE § 502.501 (also prohibiting conduct that would mislead an investor); *Wright*, 652 N.W.2d at 177 (misleading disclosures are actionable on a common-law fraud theory, citing RESTATEMENT (SECOND) OF TORTS § 551, which applies more generally to "business transactions").

Specifically, some of the "disclosures" of the mark ups and mark downs, such as those shown, *supra*, at pages 8 and 11, use what a reasonable juror could find were "cryptic" abbreviations such as "RPTD PRC" and "MK-U/D," without any explanation that these abbreviations stand for "reported price" and "mark up or down," respectively. Even where full terms rather than abbreviations are used for "reported price" and "mark up" or "mark down," as in the confirmation shown, *supra*, at page 6, the "disclosure" could still be found to be misleading. This is so, because for both kinds of disclosures, there is no explanation that the "reported price" was, in fact, the market price for the stock and that the "mark up" or "mark down," constituting the difference between the market price and the price paid or received by the investor, had been claimed by the broker as a commission or fee on the transaction. Indeed, the defendants admit that, when Parks was reviewing a confirmation slip during his deposition, he thought the "price" listed on the confirmation slip was the market price, rather than the price paid by (or to) the customer. A reasonable juror could also find that the "disclosures" were misleading, because the

mark ups and mark downs were not shown with other "fees" or "commissions." Indeed, a reasonable juror could infer that the purpose of "disclosing" the reported prices and mark ups and mark downs in the manner shown was to disguise the charging or the amounts of such fees or commissions.

Therefore, the defendants are not entitled to summary judgment on Baber's "fraud" claims on the ground that, as a matter of law, they adequately disclosed the mark ups and mark downs at issue.

The defendants also contend, however, that they are entitled to summary judgment on these claims, because the record shows that the alleged overcharges were not material. They assert that this is so, because there is no dispute that, even after learning about the allegedly excessive mark ups and mark downs, Baber continued to do business with First Republic and Parks. This is essentially the same argument that the defendants made that Baber "ratified" the mark ups and mark downs by inaction. Baber counters he is an elderly gentleman and that Parks was a "very persuasive talker" and that, in any event, no mark ups or mark downs were charged on any of the trades he made in his First Republic account after he discovered the mark ups and mark downs in December 2004.

The defendants are correct that a party asserting a "fraud" claim of any of the species at issue in this case must prove that the non-disclosure on which the claim is based involved a material fact. *See Hawley*, ___ F. Supp. 2d at ___, 2008 WL 912886 at *20 (elements of common-law fraud under Iowa law); *Schuster*, 413 F. Supp. 2d at 1009 (elements of fraud under § 10(b) of the Federal Securities Act); IOWA CODE § 502.501 (general fraud provision of the Iowa Uniform Securities Act). Again, were the court the trier of fact, the court would find troubling Baber's failure to complain promptly after learning of the mark ups and mark downs and his conducting further trades with persons or entities that he now contends defrauded him. Nevertheless, the court believes that a

jury question is presented on whether Baber waited too long to complain about any of the mark ups or mark downs, so that his apparent acquiescence after he obtained full knowledge about such charges to his account demonstrates that the charges really were not material. A jury question is also presented as to whether, after Baber learned of the allegedly excessive charges, Baber's making a few trades in his First Republic account on which no mark ups or mark downs were charged shows that such charges on prior trades were not material. The court also concludes that Baber's age and Parks's persuasiveness, among other factors, are relevant to the question of whether Baber's conduct shows that the alleged overcharges that he discovered really were not material to the underlying transactions. The answers to these questions may turn on credibility issues best left to the jury.

Therefore, the defendants are not entitled to summary judgment on these claims on their "materiality" ground, either.

## III. CONCLUSION

Although the defendants sought summary judgment on the whole panoply of Baber's claims based on allegedly secret and excessive mark ups and mark downs on his stock trades, the court finds that the defendants are not entitled to summary judgment on any of Baber's claims. Instead, all of Baber's claims will proceed to trial before a jury.

THEREFORE, the defendants' joint March 17, 2008, Motion For Summary Judgment (docket no. 57) is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 6th day of June, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA